=

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JAMAL DAMON HENDRIX, | Case No. 3:15-cv-00336-RCJ-WGC |
| Plaintiff, | **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| v. | |
| STATE OF NEVADA, *et al.*, | |
| Defendants. | |

This Report and Recommendation is made to the Honorable Robert C. Jones, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 61, 61-1 to 61-17.) Plaintiff filed a response (ECF No. 66), and Defendants filed a reply (ECF No. 70).

After a thorough review, it is recommended that summary judgment be granted in Defendants' favor.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 6.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison. (*Id.*)

On screening, Plaintiff was allowed to proceed with the following claims: (1) Count I- an Eighth Amendment deliberate indifference to safety claim against defendant Bothe; (2) Count III- First Amendment retaliation and Fourth Amendment unreasonable search claims against Baker, McDaniel, Fletcher and Byrne; (3) Count IV- an Eighth Amendment conditions of confinement claim against Smith, Winsor, Fletcher, Foster and Baker (4) Count V- First Amendment retaliation and Eighth Amendment deliberate indifference claims against Prince, Oxborrow, Smith, Fletcher,

1    Baker, Foster, McDaniel and Byrne; (5) Count VI- a First Amendment retaliation claim against

2    Fletcher, Healer, Sandoval, Baker, Foster, Cox, McDaniel and Sisco. (ECF No. 18.)

3    As such, the Amended Complaint was allowed to proceed with respect to Renee Baker,

4    Leah Bothe, Harold Byrne, James Cox, E.K. McDaniel, Michael Fletcher, Sheryl Foster, Leslie

5    Healer, Michael Oxborrow, Caroline Prince, Tasheena Sandoval, Scott Sisco, Gregory Smith, and

6    Isaac Winsor.

7    The Attorney General's Office accepted service for Baker, Byrne, Cox, McDaniel, Foster,

8    Healer, Oxborrow and Sandoval. (ECF Nos. 24, 43.) Addresses for the remaining defendants were

9    filed under seal, and the court directed the Clerk to issue summonses for those defendants: Bothe,

10    Fletcher, Prince, Sisco, Smith and Winsor.

11    Smith was served on November 22, 2017. (ECF No. 41.) Sisco was served on

12    November 29, 2017. (ECF No. 42.) Winsor was served on December 5, 2017. (ECF No. 45.) The

13    Attorney General's Office did not accept service on behalf of any of these defendants, and none

14    of them appeared or otherwise responded to the Amended Complaint. Plaintiff moved for Clerk's

15    entry of default as to Smith (ECF No. 57), and the Clerk entered default (ECF No. 58). No other

16    action has been taken with respect to Sisco or Winsor.

17    The summonses were returned as unexecuted as to Bothe, Fletcher and Prince. (ECF Nos.

18    48, 52, 53.) District Judge Jones issued a notice of intent to dismiss Bothe, Fletcher and Prince for

19    failure to timely serve them under Federal Rule of Civil Procedure Rule 4(m). (ECF No. 56.) No

20    proof of service was filed as to these defendants. Nor was good cause shown to extend the filing

21    deadline. Therefore, District Judge Jones dismissed these defendants without prejudice. (ECF No.

22    71.)

23    Defendants have moved for summary judgment.

24    ## II. LEGAL STANDARD

25    "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute

26    as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468,

27    1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all

28    reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810

1   (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall

2   grant summary judgment if the movant shows that there is no genuine dispute as to any material

3   fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other

4   hand, where reasonable minds could differ on the material facts at issue, summary judgment is not

5   appropriate. *See Anderson*, 477 U.S. at 250.

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations,
> stipulations (including those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

11  Fed. R. Civ. P. 56(c)(1)(A), (B).

12      If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

13  made on personal knowledge, set out facts that would be admissible in evidence, and show that

14  the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

15      In evaluating whether or not summary judgment is appropriate, three steps are necessary:

16  (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as

17  to a material fact; and (3) considering the evidence in light of the appropriate standard of proof.

18  *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

19  the outcome of the suit under the governing law will properly preclude the entry of summary

20  judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

21      In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

22  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

23  come forward with evidence which would entitle it to a directed verdict if the evidence went

24  uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the

25  absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage*

26  *Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In

27  contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving

28  party can meet its burden in two ways: (1) by presenting evidence to negate an essential element

- 3 -

of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

That being said,
[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

- 4 -

# III. DISCUSSION

**A. Count I**

Count I was proceeding solely against defendant Bothe, who has been dismissed from this action without prejudice. Therefore, Count I should be dismissed without prejudice.

**B. Count III**

In Count III, Plaintiff alleges that since he arrived at ESP on December 4, 2014, Baker, McDaniel, Byrne, and Fletcher formulated a policy, Operational Procedure (OP) 711, which orders prison officers to conduct strip search, body cavity searches before showers and before and after out-of-cell recreation time and showers. He claims there is no legitimate penological purpose for the second search, which is conducted while the inmate is under heavy guard and in full restraints. He asserts that since his arrival at ESP, he has filed numerous prison grievances, and that Baker and Fletcher retaliated against him by enforcing the strip search policy unreasonably on the way to and from the showers for the sole purpose of harassing, intimidating, embarrassing and humiliating him.

On screening Plaintiff was allowed to proceed with a retaliation claim based on the allegations that Baker, McDaniel, Fletcher and Byrne implemented a policy that Plaintiff was to be strip searched twice, instead of once like other prisoners, because of his protected conduct (filing grievances). In addition, he was allowed to proceed with a Fourth Amendment claim against these defendants that he was subject to an unreasonable search when he was forced to undergo two strip searches in sequence.

**1. Exhaustion- Retaliation Claim**

First, Defendants argue that Plaintiff failed to exhaust his administrative remedies as to the retaliation claim in Count III. They acknowledge that he filed grievance number 2006-29-86613 regarding his allegation that the strip searches, conducted pursuant to ESP's Operational Procedure (OP) 711 violated his Fourth Amendment rights, but contend that he did not put prison officials on notice in the grievance that the strip search policy was done in retaliation for filing grievances and lawsuits.

1    Plaintiff asserts that pursuant to NDOC's regulations, the inmate must try to informally

2    resolve the dispute and then proceed through the grievance process, which he claims he did.

3                        **a. Exhaustion Requirement**

4    The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with

5    respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

6    confined in any jail, prison, or other correctional facility until such administrative remedies as are

7    available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative

8    remedies irrespective of the forms of relief sought and offered through administrative avenues.

9    *Booth v. Churner*, 532 U.S. 731, 741 (2001).

10    The failure to exhaust administrative remedies is "'an affirmative defense the defendant

11    must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v.*

12    *Bock*, 549 U.S. 199, 204, 216 (2007)), *cert. denied*, 135 S.Ct. 403 (Oct. 20, 2014). Unless the

13    failure to exhaust is clear from the face of the complaint, the defense must be raised in a motion

14    for summary judgment. *See id.*, *overruling in part, Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th

15    Cir. 2003) (which stated that failure to exhaust should be raised in an "unenumerated Rule 12(b)

16    motion").

17    "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure

18    to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are

19    disputed, summary judgment should be denied, and the district judge rather than a jury should

20    determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted).

21    "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim. If

22    discovery is appropriate, the district court may in its discretion limit discovery to evidence

23    concerning exhaustion, leaving until later—if it becomes necessary—discovery related to the

24    merits of the suit." *Id*. at 1170 (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). If there

25    are disputed factual questions, they "should be decided at the very beginning of the litigation." *Id*.

26    at 1171.

27    Once a defendant shows that the plaintiff did not exhaust available administrative remedies,

28    the burden shifts to the plaintiff "to come forward with evidence showing that there is something

1    in his particular case that made the existing and generally available administrative remedies

2    effectively unavailable to him." *Id*. at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778

3    n. 5 (9th Cir. 1996)); *Draper v. Rosario*, 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did

4    not meet his burden when he failed to identify any actions prison staff took that impeded his ability

5    to exhaust his administrative remedies, or otherwise explain why he failed to comply with the

6    administrative remedies process). The ultimate burden of proof, however, remains with the

7    defendant. *Id*.

8         The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely

9    or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion."

10   *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the agency

11   holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id*.

12   (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis original). Thus,

13   "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison

14   grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v.*

15   *Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). "[I]t

16   is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."

17   *Jones v. Bock*, 549 U.S. 199, 218 (2007). That being said, an inmate exhausts available

18   administrative remedies "under the PLRA despite failing to comply with a procedural rule if prison

19   officials ignore the procedural problem and render a decision on the merits of the grievance at each

20   available step of the administrative process." *Reyes*, 810 F.3d at 658.

21        To reiterate, an inmate need only exhaust "available" administrative remedies. *See Ross v.*

22   *Blake*, 136 S.Ct.1850, 1858 (2016). That is, "those, but only those, grievance procedures that are

23   'capable of use' to obtain 'some relief for the action complained of.'" *Id*. at 1859 (quoting *Booth*,

24   532 U.S. at 738).

25                    **b. NDOC's Grievance Process**

26        NDOC's grievance process is set forth in Administrative Regulation (AR) 740. (ECF No.

27   61-4.) AR 740 requires an inmate to try to informally resolve grievable issues through discussion

28   with a caseworker, and if not resolved, to complete three grievance levels for exhaustion to be

1    considered complete: the informal, first and second levels. The failure to submit a proper informal

2    grievance within the time frame constitutes abandonment of the grievance at that, and all

3    subsequent levels. (ECF No. 61-4 at 7.) All documentation and factual allegations available to the

4    inmate must be submitted at the informal level. (ECF No. 61-4 at 7.) AR 740 prohibits abuse of

5    the grievance process, which includes filing a grievance with specific claims or incidents

6    previously filed by the inmate. (ECF No. 61-4 at 11.) If this occurs, the assigned caseworker is

7    required to return a copy of the improper grievance to the inmate along with Form DOC-3098, the

8    Improper Grievance Memorandum noting the specific violation. (*Id*.)

9              **c. Analysis**

10            Plaintiff does not argue that he raised the retaliation issue in grievance 2006-29-86613;

11   instead, he asserts that he discussed the retaliation issue with his caseworker prior to filing his

12   grievance. This is insufficient under AR 740. While an inmate is required to try to informally

13   resolve a grievable issue with his caseworker prior to initiating a grievance, if an issue remains

14   unresolved after informal efforts are undertaken, an inmate must complete all three written levels

15   of the grievance process.

16            While Plaintiff sufficiently raised his complaint that he was subject to an unreasonable strip

17   searches in grievance 2006-29-86613, he did not include facts to put prison officials on notice that

18   he was asserting a retaliation claim as well.

19            In *Jones v. Bock,* the Supreme Court confronted the issue of "how courts determine whether

20   a prisoner has properly exhausted administrative remedies," and "specifically, the level of detail

21   required in a grievance to put the prison and individual officials on notice of the claim." *Jones*,

22   549 U.S. at 205. "[T]o properly exhaust administrative remedies prisoners must 'complete the

23   administrative review process in accordance with the applicable procedural rules.'" *Id*. at 218

24   (quoting *Woodford*, 548 U.S. at 88).  These rules "are defined not by the PLRA, but by the prison

25   grievance process itself." *Id*. "Compliance with the prison grievance procedures, therefore, is all

26   that is required by the PLRA to 'properly exhaust.'" *Id*.

27            "The level of detail necessary in a grievance to comply with the grievance procedures will

28   vary from system to system and claim to claim, but *it is the prison's requirements,* and not the

1    PLRA, that *define the boundaries of proper exhaustion*." *Id.* (emphasis added).

2         Thus, AR 740 defines the contours of proper exhaustion. NDOC's procedure, set forth in

3    AR 740, requires inmates to submit *at the informal level*, "[a]ll documentation and factual

4    allegations available to the inmate[.]"

5         The Ninth Circuit subsequently addressed what "standard of factual specificity [is] required

6    when a prison's grievance procedures do not specify the requisite level of detail." *Griffin v. Arpaio*,

7    557 F.3d 1117, 1120 (9th Cir. 2009). In *Griffin*, the jail's procedures gave "little guidance as to

8    what facts a grievance must include" and merely advised the grievance to "[b]riefly describe [the]

9    complaint and a proposed resolution." *Griffin*, 557 F.3d at 1120.  The Ninth Circuit adopted the

10   standard articulated by the Seventh Circuit in *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002),

11   which held that "when a prison's grievance procedures are silent or incomplete as to factual

12   specificity, 'a grievance suffices if it alerts the prison to the nature of the wrong for which redress

13   is sought.'" *Id.* (quoting *Strong*, 297 F.3d at 650).

14        "A grievance need not include legal terminology or legal theories unless they are in some

15   way needed to provide notice of the harm being grieved." *Id.* "A grievance also need not contain

16   every fact necessary to prove each element of an eventual legal claim." *Id.* "The primary purpose

17   of a grievance is to *alert the prison to a problem and facilitate its resolution*, not to lay groundwork

18   for litigation." *Id.* (citing *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004)) (emphasis added).

19   The grievance must "'provide enough information … to allow prison officials to take appropriate

20   responsive measures.'" *Id.* at 1121 (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.

21   2004)).

22        After adopting the *Strong* standard, the Ninth Circuit concluded Griffin's grievance did not

23   provide notice of the alleged disregard of his lower bunk assignments to put prison officials on

24   notice of a claim of deliberate indifference to medical needs he eventually raised in his lawsuit.

25   He "did not alert the prison to the nature of the problem." *Id.* at 1121. Therefore, he failed to

26   exhaust administrative remedies.

27        While AR 740 requires an inmate to include all documentation and factual allegations

28   available *at the informal level*, it says nothing further about the level of detail of the factual

1    allegations. Judges within this district have previously found AR 740 to lack guidance regarding

2    the specificity required; therefore, the grievances are governed by the *Strong* standard. *See, e.g.,*

3    *Meeks v. Burson*, 3:12-cv-00322-MMD-WGC, 2014 WL 4666743, at *7 (D. Nev. Sept. 17, 2014);

4    *Mayo v. Williams,* 2:16-cv-00047-APG-VCF, 2016 WL 5867419, at *3 (D. Nev. Oct. 6, 2016).  In

5    other words, Plaintiff's grievance is factually sufficient to serve to exhaust a claim if "it alerts the

6    prison to the nature of the wrong for which redress is sought." *Griffin*, 557 F.3d at 1120 (citation

7    omitted).

8            In his informal level grievance, Plaintiff asserted he was subjected to numerous body and

9    cavity searches every time he leaves his cell to go to the shower or the yard for exercise. (ECF No.

10   61-6 at 7-9.) He indicated he was stripped to go to the shower and yard while in his cell and is then

11   strip searched again when he is escorted by two or three officers and watched the entire time. (*Id.*)

12   The informal (or the first and second level) grievance never mentioned he was subject to the

13   searches because he had filed grievances or complaints.

14           Therefore, the court agrees that Plaintiff failed to exhaust his administrative remedies with

15   respect to the retaliation claim set forth in Count III, and summary judgment should be granted in

16   Defendants' favor.

17           **2. Fourth Amendment Claim**

18           From December 2013 to June 2014, and September 2014 to April 2015, Plaintiff was

19   housed in disciplinary and administrative segregation at ESP. (ECF No. 61-1; Gittere[1] Decl.,

20   ECF No. 61-3 ¶¶ 7-8.) ESP is NDOC's designated maximum-security prison.[2] As such, Plaintiff

21   was subject to ESP's OP 711, which was in effect from July 1, 2013, until July 10, 2015. (Gittere

22   Decl., ECF No. 61-3 ¶ 8; ECF No. 61-10.)[3] OP 711 governed segregation unit operations. An

23   inmate was placed in administrative segregation if his "continued presence in the general

24   population pose[d] a serious threat to life, property, self, staff or other inmates, or to the security

25   _____

26           [1] William Gittere is an Associate Warden of Operations at ESP, and is responsible for supervision of the
     institutional files (I Files) for inmates incarcerated within ESP.

27           [2] *See* doc.nv.gov/Facilities/ESP_Facility/, last visited September 14, 2018.

28           [3] The Gittere declaration has two paragraphs numbered 8, and this reference is to the second paragraph
     number 8.

or orderly running of the institution." (ECF No. 61-10 at 5.) Disciplinary segregation "is a form of separation from the general population in which inmates who have committed general, major, or work release violations of the Code of Penal Discipline …are segregated but retain some privileges." (*Id.* at 4.)

OP 711 provided, among other things, the policies and procedures for searches of inmates in the segregation units. (Gittere Decl., ECF No. 61-3 ¶ 8; ECF No. 61-10 at 15-21.) More specifically, OP 711 contained the policies and procedures for movement of inmates to the showers and recreation yard that are at issue here. It also provided general procedures for unclothed and clothed body searches for all inmate movement to be observed by ESP personnel. It makes an initial clarification that a "visual body cavity search" is a "search[ ] of the anal opening." (ECF No. 61-10 at 1.) While Plaintiff references "body cavity searches" in his Amended Complaint, he provides no specific evidence that this type of search occurred, as it is defined by OP 711.

All inmate movement in a segregation unit is under gun coverage from the control room, and movement in such unit is kept to a minimum. (ECF No. 61-10 at 16.) All inmate movement leaving or within a segregation unit consist of at least two correctional staff to every inmate. (*Id.*) When inmates are escorted in a segregation unit they are to go directly to the destination, and are not to stop and communicate at another cell in the unit. (*Id.*)

For movement to the shower, only one inmate at a time is permitted in the lower two showers as well as the upper two showers. (*Id.* at 17.) Cell windows will be completely uncovered and the cell light is to be completely uncovered and turned on, with the inmate being completely visible to the officer. (*Id.*) The officer orders the inmate to stand at the rear of the cell, and will visually inspect the inmate for any evidence of contraband prior to opening the food slot door. (*Id.*) The inmate will then receive an unclothed body search, where all clothing is handed to the officer through the food slot door. (*Id.*) Upon completion of this search, the underwear and shoes will be returned to the inmate to wear to the shower. (*Id.*) All other clothing or items will be searched and carried to the destination prior to the inmate's escort. (*Id.*) The inmate will be handcuffed through the food slot door with his hands behind his back, and then will be ordered to kneel down. (*Id.*) The officer will signal the control room officer to open the cell door, and the escorting officer will

apply leg restraints. (*Id*.) The escorting officers will then assist the inmate to his feet. (*Id*.)

Each officer will hold the inmate by his upper arm during escort to the shower. (*Id*.) Prior to placing the inmate in the shower, the shower will be searched by staff. (*Id*.) The inmate will be placed in the shower, and will be ordered to kneel down and the leg restraints will be removed. (*Id*.) The door will be secured and the inmate will be ordered to stand up, place his hands out through the restraint slot to have the handcuffs removed. (*Id*.) The escorting officer will return the inmate's clothing and personal hygiene items, and the inmate is given ten minutes to shower. (*Id*.) When the inmate is returned to his cell, this procedure is followed in reverse order. (*Id*. at 18) There is only one inmate on the tier under escort at a time. (*Id*.)

For movement to the recreation yard, again the cell windows and light are to be uncovered, with the inmate clearly visible to the officer. (*Id*.) The inmate is ordered to stand at the rear of the cell for a visual inspection for any evidence of contraband before the food slot door is opened. (*Id*.) The inmate receives an unclothed body search where he again hands his clothing through the food slot door to the officer. (*Id*.) When this is completed, the underwear and shoes are returned to the inmate to wear to the shower. (*Id*.) All other clothing or items are searched and carried to the destination prior to the escort. (*Id*.) The inmate is handcuffed through the food slot and is ordered to kneel, at which point the officer signals the control room officer to open the cell door and applies leg restraints. (*Id*.) The inmate is then escorted to the shower closest to his cell that is not occupied, where he is placed and ordered to kneel. (*Id*.) The escorting officer removes the leg restraints and the shower door is secured. (*Id*.) The inmate is ordered to back up to the door and place his hands to the slot so handcuffs can be removed. (*Id*. at 19.) The escorting officer then conducts an unclothed body search of the inmate, and his clothing is returned after being searched. (*Id*.) The inmate is ordered to dress, and then to back up and put his hands through the slot to re-apply the handcuffs. (*Id*.) The inmate is ordered to kneel, and the shower door is opened and leg restraints are re-applied. (*Id*.) The inmate is then escorted by the officers to the recreation yard. (*Id*.) He is placed in the yard, and restraints are removed. (*Id*.) When the inmate is returned to his cell, this procedure is followed in reverse. (*Id*.) There is only one inmate on the tier under escort at a time. (*Id*.)

According to Defendants, the rationale for the two unclothed body searches was to give escorting officers the ability to ensure the inmate wasn't concealing a weapon or contraband. (Gittere Decl., ECF No. 61-3 ¶ 8.) Unclothed searches in the cell only allowed viewing through an approximate four-inch window, whereas the searches conducted in the showers allowed for unobstructed view. (*Id.*) An inmate could potentially have a weapon taped to the door or concealed out of view of an officer and could hide it if allowed to dress and go directly to the yard. (*Id.*) As such, the rationale was to ensure the safety and security of correctional officers and inmates located in the segregation units at ESP. (*Id.*) Plaintiff was not the only inmate to undergo these procedures, as they applied to all inmate movement in the units. (*Id.* ¶ 10.)

Defendants argue that OP 711 does not violate the Fourth Amendment, since it was enacted to ensure inmates being transported from cells to other parts of the prison are not carrying weapons or contraband, and as such, was reasonably related to the legitimate correctional interest of safety and security. They argue that the manner, scope, justification and placed of the unclothed bodily searches were all reasonable. First, they contend that the manner and scope were reasonable because the searches were visual and there was no touching of the inmate when the inmate was escorted to the showers or recreational yard. Second, they claim the justification for the search was reasonable as the purpose was to ensure inmates were not in possession of weapons in their cells before going to the shower or yard, and after returning from the shower or yard. They argue the second search was necessary because the first search only allowed viewing through an approximately four-inch window, while searches in the showers allowed an unobstructed view. Finally, they contend the place was reasonable because it was conducted in the cell and then in the shower. In the cell, the only person who could view the search was the correctional officer and cellmate if the inmate had one. In the shower, the only person present was the inmate.

Plaintiff, on the other hand, contends that being subjected to multiple strip searches each time he left his cell to go to the showers or yard was unjustified. He asserts that when a prison goes to the shower or yard, they are searched by officers through the door food slot and cell window as they order prisoners to undress from the back of the cell in full view. (ECF No. 66 at 15.) Then, they are observed by officers through the window for a "fully body cavity search," told to back up

1   to the food slot to retrieve their clothes, and then are ordered to be handcuffed from behind as well

2   as in leg shackles and are escorted to the shower by two to three officers, and cannot reach any

3   other prisoners' cells. (*Id.*) Once in the shower, they are searched again, and again when they return

4   to the cell from the shower or yard. (*Id.* at 16.)

5          Prisoners retain basic constitutional rights. *Turner v. Safley*, 482 U.S. 78, 84 (1987)

6   ("Prison walls do not form a barrier separating prison inmates from the protections of the

7   Constitution."). The right at issue is the Fourth Amendment right to be free from "unreasonable

8   searches and seizures." U.S. Const., amend IV. "[S]imply because prison inmates retain certain

9   constitutional rights does not mean that these rights are not subject to restrictions and limitations."

10  *Bell v. Wolfish,* 441 U.S. 520, 545 (1979).  The reasonableness of a particular search is examined

11  in reference to the prison context. *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988).

12          The test of reasonableness under the Fourth Amendment is not capable of precise
            definition or mechanical application. In each case it requires a balancing of the need
13          for the particular search against the invasion of personal rights that the search
            entails. Courts must consider the *scope* of the particular intrusion, the *manner* in
14          which it is conducted, the *justification* for initiating it, and the *place* in which it is
            conducted.

15  *Bell*, 441 U.S. at 559 (emphasis added).

16          In *Turner v. Safley*, the Supreme Court held that "when a prison regulation impinges on

17  inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate

18  penological interests." *Turner*, 482 U.S. at 89. The Court identified four factors that guide

19  reviewing courts in applying this test: 1) the existence of a valid, rational connection between the

20  prison regulation and the legitimate governmental interest put forward to justify it; 2) the existence

21  of alternative means of exercising the right that remain open to prison inmates; 3) the impact that

22  accommodation of the asserted constitutional right will have on guards and other inmates, and on

23  the allocation of prison resources generally; and 4) the absence of ready alternatives as evidence

24  of the reasonableness of the regulation. *Id*. at 89-91. *Turner* applies whenever "the needs of prison

25  administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990).

26  Courts have applied *Turner* to prisoners' Fourth Amendment claims, as well as First and

27  Fourteenth Amendment claims.

28

In *Michenfelder v. Sumner*, the Ninth Circuit said: "Not all four [*Turner*] factors will be relevant to each case. 860 F.2d 328 (9th Cir. 1988). For example, the second *Turner* factor— availability of other avenues for exercising the right infringed upon—is much more meaningful in the [F]irst [A]mendment context that the [F]ourth or [E]ighth, where the right is to be free from a particular wrong." *Michenfelder*, 860 F.2d at 333 n. 1. *Turner*'s factors, however, "can be instructive in the context of other prisoners' rights cases[.]" *Id.*

In applying the actors, great deference must be given to prison officials' assessments of their interests. "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [security and operation considerations], courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 540 n. 23 (internal quotation marks and citation omitted).

In *Michenfelder*, the Ninth Circuit applied *Turner* to a prison strip search policy. The court concluded the strip searches were reasonably related to legitimate penological interests, and analyzed the searches in light of the balancing test set forth in *Bell v. Wolfish*, even though *Bell* was decided before *Turner*. While *Michenfelder* found the strip search policy at issue was reasonable, it recognized that strip searches that are excessive, vindictive, harassing or unrelated to any legitimate penological interest are not reasonable. *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988).

In *Rickman v. Avaniti*, 854 F.2d 327 (9th Cir. 1988), the Ninth Circuit approved strip searches that were conducted every time prisoners in administrative segregation left their cells for any purpose.

In *Michenfelder*, the court considered routine searches where the inmate was in the most restrictive custody status, stating that "[e]levated security precautions are justified for prisoners placed in maximum security settings usually because of a history of maladaptive behavior within prison." *Michenfelder*, 860 F.2d at 332. (citing *Hay v. Waldon*, 834 F.2d 481, 486 (5th Cir. 1987) (visual body cavity search each time an administrative segregation inmate enters or leaves his cell was reasonable); *Goff v. Nix*, 803 F.2d 358, 364-65 (8th Cir. 1986) (strip searches and visual body cavity searches every time an inmate leaves the maximum security unit reasonable), *cert. denied*,

484 U.S. 835; *Campbell v. Miller*, 787 F.2d 217, 228 (7th Cir. 1986) (routine visual body cavity searches before and after library visits reasonable), *cert. denied*, 479 U.S. 1019; *Arruda v. Fair*, 710 F.2d 886 (1st Cir. 1983) (upheld routine visual body cavity searches of maximum security inmates when leaving or returning from law library, infirmary, and visits)).

In *Michenfelder*, prisoners in the unit were searched "both coming and leaving their cells, even when traveling only within the unit under escort and in chains at all times." *Michenfelder*, 860 F.2d at 332. Even under these circumstances, the court stated: "so long as a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose." *Id.* at 333 (citation omitted). In addition, the court found that the inmate did not demonstrate that the prison officials "used exaggerated or excessive means to enforce security" or that the searches at issue were conducted in the absence of the opportunity to obtain contraband or a weapon. *Id.*

The searches at issue here were visual only, and applied to all inmate movement from the cells to the showers or recreational yard. The Ninth Circuit has upheld both visual only and visual body cavity searches. *Thompson v. Souza*, 111 F.3d 694, 700 (9th Cir. 1997); *Michenfelder*, 860 F.2d at 332.

Defendants have proffered evidence that the purpose of OP 711 was to maintain the safety or correctional officers and inmates at ESP by making sure inmates were not concealing contraband or weapons. The first searches took place in the cell, with the officer viewing the inmate through an approximately four-inch opening. The second search was conducted in the shower where the officer could have an unobstructed view. The searches took place within the context of segregation units at ESP, which is NDOC's maximum security prison.

The first search was conducted in the inmate's cell in the presence of only the inmate, and a cellmate if applicable and the escorting officers. During the second search, the inmate was placed in the shower, in the presence of only the escorting officers. Plaintiff offers no specific argument that the place where the searches were conducted were unreasonable. In *Rickman*, the fact that the strip search took place in the inmate's cell was a factor in determining its reasonableness. *Rickman*, 854 F.2d at 328-29. The search with only the inmate and officers present in the shower is similarly

- 16 -

reasonable.

The first *Turner* factor is whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. The prison had a legitimate interest in making sure inmates moving within NDOC's maximum security prison were not able to conceal contraband or weapons.

The second *Turner* factor, "whether there are alternative means of exercising the right that remain open to prison inmates, does not apply to the Fourth Amendment claim. *See Michenfelder*, 860 F.2d at 331 n. 1.

The third *Turner* factor is "the impact accommodation of the asserted constitutional right will have on guards and inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. This factor is not particularly relevant here, and is addressed in the context of the other factors in *Bell* and *Turner*.

The fourth *Turner* factor is the "absence of ready alternatives [as] evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. While Plaintiff suggests that a single search would be sufficient, the court is not willing to second guess prison officials' judgment that the security conditions at ESP required searches in the cell and the shower before and after an inmate is taken to shower and go to the recreational yard.

The court finds that all of the above factors weigh in favor of finding that OP 711's policies and procedures concerning searches of inmates going to and from the showers were reasonably related to the legitimate correctional goal of maintaining safety and security in NDOC's maximum security prison. While Plaintiff appears to argue that the policy was an exaggerated response because inmates were moved in full restraints and under escort, the policy in question is very similar to that upheld in *Michenfelder*, which required visual body cavity searches whenever an inmate housed in the most restrictive unit at the Nevada State Prison (NSP) left or returned to his cell. The frequency of the searches was very high, and prisoners there were searched even when they moved only within the segregation unit, and even if they were under escort and in restraints the entire time. Plaintiff has simply not met his burden of showing that prison officials "intentionally used exaggerated or excessive means to enforce security." *Michenfelder*, 860 F.2d

- 17 -

1   at 333.

2        Therefore, summary judgment should be granted in Defendants' favor with respect to the

3   Fourth Amendment claim in Count III.

4        In light of this conclusion, the court need not reach Defendants' qualified immunity

5   argument.

6   **C. Counts IV and V**

7        In Count IV, Plaintiff alleges that on September 15, 2014, Winsor denied him adequate

8   clothing (State issued clothing and a State issued towel), and that Winsor refused to provide these

9   items between June and December of 2014. As such, Plaintiff alleges he was without underclothing

10  and shoes to combat the cold weather in his cell, or a State issued towel to dry off with. He contends

11  that Smith, Foster, Baker, and Fletcher failed to intervene when placed on notice by his inmate

12  grievances. On screening, Plaintiff was allowed to proceed with an Eighth Amendment conditions

13  of confinement claim in Count IV against Winsor, Smith, Fletcher, Foster, and Baker.

14       In Count V, Plaintiff alleges on October 3, 2014, Prince denied him adequate clothing. He

15  avers that Prince notified him by prison intercom that he had a laundry exchange inventory, but

16  Plaintiff did not respond because he was asleep. When he got up, he responded, but claims that

17  Prince refused to let him have the clothing exchange because he was late. He alleges that he told

18  Prince he was without shoes that fit his feet, or socks because the old ones had recently been

19  confiscated because they were torn. He claims that Oxborrow was made aware of this by a

20  grievance, and during his weekly tour of the housing unit, but failed to intervene. He asserts that

21  Cox, Foster, McDaniel, Baker, Fletcher and Sandoval failed to properly supervise and train Prince

22  and Oxborrow, and that they were policy makers with the ability to intervene. On screening, he

23  was allowed to proceed with a First Amendment retaliation claim and an Eighth Amendment

24  deliberate indifference claim in Count V against Prince, Oxborrow, Smith, Fletcher, Baker, Foster,

25  McDaniel, and Byrne.

26       First, Defendants argue that Plaintiff failed to exhaust his administrative remedies with

27  respect to the claims raised in Counts IV and V. Second, they assert that Plaintiff cannot maintain

28  his claim that his Eighth Amendment rights were violated.

### 1. Exhaustion- 8th Amendment Claims

Defendants acknowledge that Plaintiff filed grievance No. 2006-29-86612, asserting that Prince refused to give him adequate clothing, and completed the grievance through the second level, with each grievance receiving a response on the merits. They contend, however, that he did not assert in the grievance that he suffered from any medical symptoms from allegedly not having adequate clothing. Therefore, they allege that his Eighth Amendment claims in Counts IV and V should be dismissed for failing to exhaust his administrative remedies.

Defendants also acknowledge Plaintiff filed grievance numbers 2006-29-86260 and 2006-29-93371, claiming that Oxborrow and Prince did not give him adequate clothing after September 2014. Again, they contend that he did not assert in either of these grievances that he suffered any adverse medical symptoms as a result. Moreover, they contend Plaintiff did not properly complete these grievances. Grievance 2006-29-86260 was not addressed at the second level as it was found to be duplicative of other grievances, and Plaintiff did not file a second level grievance for grievance 2006-29-93771.

Plaintiff argues that he did exhaust administrative remedies in grievance 2006-29-86612. He asserts that the grievance need not contain every fact necessary to prove each element of an eventual legal claim, and he alleged harm due to lack of clothing, which he contends is sufficient.

He states that grievance 2006-29-86612 pertains to Prince's refusal to provide him with adequate clothing; grievance 2006-29-86260 pertains to not receiving adequate clothing exchange from Winsor; and grievance 2006-29-933771 pertains to Oxborrow not providing Plaintiff with relief for such clothing.

Plaintiff submitted an informal level grievance, assigned grievance number 2006-29-86612, on October 3, 2014. (ECF No. 61-7 at 7-12.) He stated that on October 3, 2014, he was denied an inventory check of his state-issued clothing by correctional officer Prince. (ECF No. 61-7 at 7.) He indicated that he had recently filed a grievance that he was not receiving his clothing as well as a State-issued towel, bed sheet, and exchange of his State-issued shoes, which were too big in size. (*Id*. at 7-8.) He says this was because he was sleeping when Prince called his cell via intercom. (*Id*. at 8.) He referenced his Eighth and Fourteenth Amendment rights to adequate

1    clothing. (*Id*.) His requested remedy was to receive his towel, socks, and proper size State-issued

2    sneakers, as well as $100 in monetary relief. (*Id*.)

3        In response, M. Drain told him: "According to laundry staff unit staff inventoried your

4    laundry items on 10-20-2014 in question and stated you have all allowed state issue laundry items."

5    (ECF No. 61-7 at 6.)

6        He filed a first level grievance, disagreeing with the informal level response, stating that

7    no one ever inventoried his property, that his shoes were still the same, and this was preventing

8    him from going out to the exercise yard. (ECF No. 61-7 at 5.) R. Baker responded: "Your

9    complaint concerning a laundry issue has been addressed with laundry staff. Records show you

10    were issued state shoes on 12-11-14. You will also be issued a state towel, three pairs of socks,

11    and one pair of boxers." (ECF No. 61-7 at 4.)

12        Plaintiff filed a second level grievance disagreeing with the first level response. (ECF No.

13    61-7 at 2.) He stated he never received the three pairs of socks, and pair of boxers. (*Id*.) He stated

14    that Oxborrow knew Baker had ordered this, and still ignored the order. (*Id*.) He went on to state

15    that he had no socks, and that his feet were cold in the winter seasons. (*Id*.) G. Smith responded:

16    "I have reviewed your claims and the prior responses. Records reflect you have received the towel,

17    shoes and three pairs of socks and as of January 29th, the Ely State Prison Laundry has been

18    directed to provide the underwear to complete your issue. I find no evidence of a civil rights

19    violation, your grievance is denied." *Id.* (ECF No. 61-7 at 3.)

20        The grievance is accompanied by an e-mail dated January 28, 2015, from Michael

21    Oxborrow to John Nakashima regarding Plaintiff, stating: "Hendrix also needs one pair of

22    underwear. He did not tell me that when I discussed his laundry issue at his cell door. But did

23    mention it on his grievance. Please issue. Thanks." (ECF No. 61-7 at 13.)

24        The court agrees that Plaintiff did not put prison officials on notice that he was asserting a

25    claim regarding a serious medical need through this grievance, so as to proceed with an Eighth

26    Amendment deliberate indifference to serious medical need claim in this action. He does, however,

27    adequately put prison officials on notice of a conditions of confinement claim related to inadequate

28    clothing. While the screening order references an Eighth Amendment deliberate indifference claim

in Count V, the court interprets Plaintiff's allegations in Count IV and Count V as asserting Eighth Amendment conditions of confinement claims, and not an Eighth Amendment deliberate indifference to serious medical needs claim. The court assumes that confusion arose because the claim in Count V was labeled "Eighth Amendment deliberate indifference" and Defendants assumed this was referring to a medical care claim; however, both conditions of confinement and medical care claims apply the deliberate indifference standard.

Therefore, Defendants' motion should be denied insofar as it argues that Plaintiff failed to exhaust his administrative remedies with respect to the Eighth Amendment claims in Counts IV and V. The court finds, *infra*, however, that Plaintiff failed to raise a genuine dispute of material fact with respect to the merits of those Eighth Amendment claims, and as such, still recommends that summary judgment be granted in Defendants favor with respect to the Eighth Amendment claims in Counts IV and V.

**2. Exhaustion- Retaliation Claim**

Defendants argue that Plaintiff alleges that Defendants denied him adequate clothing after September 2014, as a form of retaliation for filing grievances and lawsuits; however, he did not allege any facts giving prison officials adequate notice of a retaliation claim in grievance 2006-29-86612.

Plaintiff argues that he need not specify all legal theories, and therefore he exhausted his administrative remedies with respect to the retaliation claim.

Grievance 2006-29-86612 is summarized above, and did not put prison officials on notice that he was claiming he was being retaliated against for filing grievances.

Plaintiff references two other grievances in connection with his inadequate clothing claims: grievance 2006-29-86260 and grievance 2006-29-93771. Plaintiff provides this grievance documentation in connection with his response, and it was also submitted by Defendants. (ECF No. 66 at 62-85; ECF Nos. 61-8, 61-9.)

Grievance 2006-29-86260 was rejected at the second level with an improper grievance memorandum indicating that the grievance was duplicative of grievance 2006-29-86612. (ECF No. 66 at 75; ECF No. 61-8 at 2.) Plaintiff does not present any argument that the grievance

1    process was unavailable to him with respect to grievance 2006-29-86260, and he did not receive a

2    response on the merits at the second level so as to complete the grievance process for grievance

3    2006-29-86260.

4         Grievance 2006-29-93771 was also rejected at the first and second levels as improper

5    because it raised specific claims previously filed by Plaintiff. (*See* ECF No. 66 at 80, 85, ECF No.

6    61-9 at 2, 4.) Again, Plaintiff does not present any argument that the grievance process was

7    unavailable to him with respect to grievance 2006-29-93771, and he did not receive a response on

8    the merits at the first or second levels so as to complete the grievance process for grievance 2006-

9    29-86260.

10        In conclusion, the court finds Plaintiff failed to exhaust his administrative remedies with

11   respect to the First Amendment retaliation claim asserted in Count V. Therefore, summary

12   judgment should be granted in Defendants' favor as to this claim.

13        **3. Merits of the Eighth Amendment Claims in Counts IV and V**

14        What remains of Counts IV and V are the claims that the Defendants denied him adequate

15   clothing in violation of the Eighth Amendment.

16        The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S.

17   Const., amend. VIII. "It is undisputed that the treatment a prisoner receives in prison and the

18   conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth

19   Amendment." *Helling v. McKinney,* 509 U.S. 25, 31 (1993); *see also Farmer v. Brennan,* 511 U.S.

20   825, 832 (1994).

21        Although conditions of confinement may be restrictive and harsh, they may not deprive

22   inmates of "the minimal civilized measures of life's necessities." *Rhodes v. Chapman,* 452 U.S.

23   337, 347 (1981). Prison officials must provide prisoners with adequate "food, clothing, shelter,

24   sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th

25   Cir. 1986), *abrogated in part on other grounds by Sandin v. Conner,* 515 U.S. 472 (1995); *see also*

26   *Brown v. Plata,* 131 S.Ct. 1910, 1929 (2011) (internal citation and quotation marks omitted) ("To

27   incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are

28   dependent on the State for food, clothing, and necessary medical care."). "The circumstances,

1    nature, and duration of a deprivation of [] necessities must be considered in determining whether

2    a constitutional violation has occurred." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

3        Where a prisoner alleges injuries stemming from conditions of confinement, prison

4    officials may be liable only if they acted with "deliberate indifference to a substantial risk of

5    serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). The alleged deprivation must

6    be, in objective terms, "sufficiently serious." *Farmer*, 511 U.S. at 834 (citation omitted). Then, the

7    prison official must "know of and disregard an excessive risk to inmate health or safety." *Id*. at

8    837.

9        "The denial of adequate clothing can inflict pain under the Eighth Amendment." *Walker v.*

10    *Sumner*, 14 F.3d 1415, 1421 (9th Cir. 1994) (citation omitted), *abrogated in part on other grounds*

11    *by Sandin v. Conner*, 515 U.S. 472 (1995).

12        In *Walker*, the Ninth Circuit affirmed the district court's grant of summary judgment in

13    favor of prison officials on the inmate's claim that his Eighth Amendment rights were violated

14    regarding a lack of adequate clothing. *Walker,* 14 F.3d at 1421. *Walker* suggested that in

15    determining whether inadequate clothing rises to the level of a constitutional violation, a court

16    must consider the weather conditions at the time, any pain inflicted by the clothing restriction, and

17    the clothing that is in fact available to the inmate at the time. *Id*.

18        The court will address the underlying alleged constitutional violation first, and then will

19    address, if necessary, the claims that certain of the defendants are not liable because their

20    participation was limited to responding to Plaintiff's grievances.

21        Defendants present evidence of the following:

22        Plaintiff arrived at ESP around December 4, 2013. (ECF No. 61-1 at 2.)

23        The ESP laundry procedures are governed by OP 716. (ECF No. 61-13.) When an inmate

24    arrives at ESP, a supervisor issues a bag with a blanket, two sheets, one pillow, one towel and a

25    pillowcase, and it is assumed inmates arriving will have one issue of clothing. (ECF No. 61-13 at

26    3.) If an inmate is short on clothing, he is to kite the laundry requesting the items he needs. (*Id*.)

27    Clothing, bedding and towels are issued as needed, but not before six months from the last issue

28    (except for pillows which are not issued sooner than twelve months from the last issue). (*Id*. at 4.)

Inmates with personal clothing, bedding or towels, will not receive a State issue for those items. (*Id*.) After the laundry officer receives a kite requesting clothing, the officer is to check the index card to ensure the requesting inmate did not receive the approved issue and that the inmate has not had a laundry inventory within six months of the date requested. (*Id*.) The laundry officer is then to send to the supervisors an inventory list for verification of the inmate's clothing inventory. (*Id*.) The shift supervisor sends an inventory sheet to the unit to be completed the next day. (*Id*.) After that is done, the sheet is returned to the shift supervisor for verification and returned to the laundry officer so the correct clothing can be issued the following week. (*Id*.)

The State minimum issue is three t-shirts, three boxers, three pairs of socks, two pants, and two dress shirts. (Kerner[4] Decl., ECF No. 61-15 ¶ 6.) If an inmate has over the State minimum, he is deemed ineligible for exchange. (*Id*. ¶ 7.) If an inmate runs out of clothing or laundry items, destroys his items, or the items are no longer fit to be used, the laundry department is required to issue replacements. (*Id*. ¶ 12.)

Plaintiff was housed in ESP's unit U4A from September 15, 2014 through April 22, 2015. (ECF No. 61-1; Houston[5] Decl., ECF No. 61-2 ¶ 7.) At that time, this was the administrative segregation (Ad Seg)/disciplinary segregation (Dis Seg) unit. (Houston Decl., ECF No. 61-2 ¶ 7.) Again, OP 711 governs segregation unit operations, and also discusses clothing allowances for inmates in the segregation unit. (ECF No. 61-10 at 10; Houston Decl., ECF No. 61-2 ¶ 8.) In Ad Seg/Dis Seg, the inmate's "personal clothing" is limited to: underwear (including thermal underwear), socks, hats, and one pair of shoes, not including shower shoes. (ECF No. 61-10 at 10, 11.)

On January 29, 2014, Plaintiff was issued two pair of boxers. (*See* Houston Decl., ECF No. 61-2 ¶¶ 9-14; ECF No. 61-12 at 2.) A clothing inventory slip dated February 3, 2014, indicates that at that time, Plaintiff had three personal thermal tops, two personal thermal bottoms, one State jumpsuit, three State t-shirts, two State boxers, 3 personal boxers, and 6 State socks. (ECF No. 61-

---

[4] Curtis Kerner is a correctional sergeant in the laundry department at ESP, and his responsibilities include processing laundry per ESP OP 716 and AR 704.

[5] Robert Houston is a correctional lieutenant at ESP, and the custodian of record for custody logs.

11 at 2.)

On March 25, 2014, he was issued two t-shirts, one pair of boxers, and three pairs of socks. (*Id.*) On June 23, 2014, he was issued a towel. (ECF No. 61-12 at 2.) On July 2, 2014, he was issued one t-shirt, one pair of boxers, and one pair of socks. (ECF No. 61-12 at 2.) On December 11, 2014, he was issued deck shoes. (ECF No. 61-12 at 2.) On January 26, 2015, he was issued three pairs of socks. (ECF No. 61-12 at 2.)

As to Count IV, Plaintiff asserts that on September 15, 2014, he was denied adequate clothing such as shoes, socks and undergarments by Winsor. (Pl. Aff., ECF No. 66 at 36-37 ¶ 3.) He states that as a result, he suffered from sickness, such as muscle soreness from no out of cell exercise, nose bleeds, lost sleep from freezing cell temperatures and seizures from severe headaches. (*Id.* ¶ 5.)

With respect to Count V, Plaintiff contends that on October 3, 2014, Prince denied him adequate clothing to combat the winter weather in retaliation for using the prison's grievance system. (Pl.'s Aff., ECF No. 66 at 40-41 ¶ 3.) He states that Prince knew he was given permission to receive adequate clothing through the inventory channel, but refused to execute the order. (*Id.* ¶ 4.) As such, he was without clothing to combat the cold weather in his prison cell. (*Id.* ¶ 5.) He claims that Oxborrow, Fletcher, Baker and Smith failed to intervene and act to prevent his suffering as he placed them on notice through his grievance. (*Id.* ¶ 6.)

The court agrees with Defendants that Plaintiff's conclusory statements in his affidavit are insufficient to raise a genuine dispute of material fact as to whether he was denied adequate clothing such that his Eighth Amendment right to be free from the infliction of pain was violated. Defendants have produced evidence consisting of the pertinent institutional procedures and records of clothing issued to Plaintiff during the relevant time period. As in *Walker,* Plaintiff's allegations of inadequate clothing are somewhat vague and confusing. Plaintiff does not address the discrepancy between the records showing what clothing was issued, and his claim that he did not have adequate clothing. Nor does he specify at any point what clothing he actually had during this time period, which the court in *Walker* characterized as the "most important" factor. *Walker,* 14 F.3d at 1421. While he states generally that he was without adequate clothing to combat the

1    winter weather, he provides no factual detail to allow the court to conclude that he did in fact suffer

2    the infliction of pain "of a constitutional magnitude." *Id*. Therefore, the court recommends that

3    summary judgment be granted in Defendants' favor with respect to the Eighth Amendment claims

4    in Counts IV and V.

5    **D. Count VI**

6    In Count VI, Plaintiff alleges that for seventy-eight days he was denied the ability to change

7    clothing while in the facility's medical housing unit in retaliation for not agreeing to a settlement

8    agreement with Foster and Fletcher in another civil rights action. He alleges that Fletcher escorted

9    him to a case conference and told Plaintiff he would get his property back if he settled the case.

10   Plaintiff did not resolve the case, and avers that defendants Healer, Sandoval, Baker, Foster, Cox,

11   McDaniel and Sisco all refused to help him get his clothing despite his grievances describing the

12   circumstances. On screening, Plaintiff was allowed to proceed with a First Amendment retaliation

13   claim in Count VI against Fletcher, Healer, Sandoval, Baker, Foster, Cox, McDaniel and Sisco.

14   With respect to the allegations against Foster and Healer (Fletcher has been dismissed

15   without prejudice), Defendants argue Plaintiff cannot prove a retaliation claim because even if

16   Plaintiff was denied his personal property, it was not because he did not settle a case, but pursuant

17   to ESP regulations governing personal property in the infirmary housing unit. Next, insofar as

18   Plaintiff names Sandoval, Cox, Baker, McDaniel and Sisco, they argue those Defendants should

19   be dismissed based on a lack of personal participation, as Plaintiff only alleges they were made

20   aware of the purported complaints via grievances and did not give Plaintiff the requested relief.

21   They also assert that the failure to train allegations do not give rise to a claim.

22   From June 25, 2014 to September 15, 2014, Plaintiff was housed in ESP's Unit 9A, which

23   is the infirmary. (ECF No. 61-1 at 2; Gittere Decl., ECF No. 61-3 ¶ 7.) ESP's OP 605 governs

24   ESP's infirmary operations. (ECF No. 61-14.) Inmates are issued property consistent with the

25   inmate's compliance with his treatment plan. (ECF No. 61-14 at 5.) Personal clothing in the

26   infirmary is limited to: underwear (including thermal underwear), socks, hats, jackets/coats, one

27   pair of shoes, and one State-issued jumpsuit. (ECF No. 61-14 at 5.) Yellow coveralls are issued to

28   each inmate assigned to the infirmary, and are exchanged on scheduled days for a clean set, with

the proviso that an inmate is not allowed to have more than one set at a time. (*Id*.) When the inmate is admitted to the infirmary and issued a set of yellow coveralls, the clothing he was wearing is sent to the property room. (*Id*. at 7.) The inmate's property is confiscated and inventoried, and upon release from the infirmary, the inmate can go to the property room and request return of property. (*Id*.)

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015). Such a claim consists of five elements:

> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)).

"The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts, for '[w]ithout those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices.'" *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. Oct. 6, 2017) (quoting *Rhodes*, 408 F.3d at 567).

"[A] plaintiff must show that his protected conduct was 'the "substantial" or "motivating" factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). The plaintiff "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [the defendant's] intent[.]" *Id*. (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).

To raise a triable issue as to motive, a plaintiff must offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." *McCollum v. Cal. Dep't of Corr. and Rehab*, 647 F.3d 870, 882 (9th Cir. 2011) (citation and quotation marks omitted). Circumstantial motive evidence may include: "(1) proximity in time between protected speech and the alleged retaliation; (2) the [defendant] expressed opposition to the [protected conduct]; [or] (3) other evidence that the reasons proffered by the [defendant] for

- 27 -

1    the adverse … action were false and pretextual." *Id.* (internal citation and quotation marks

2    omitted).

3          A plaintiff's mere speculation that there is a causal connection is insufficient. *See Wood v.*

4    *Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citations omitted) (affirming grant of summary judgment

5    where there was no evidence that defendants knew of plaintiff's prior lawsuit, or that defendant's

6    disparaging remarks were made in reference to the prior lawsuit).

7          First, the court finds Plaintiff has presented no evidence to create a genuine dispute of

8    material fact that Healer, Sandoval, Baker, Foster, Cox, McDaniel and Sisco retaliated against him.

9    In his affidavit, the only thing Plaintiff states with respect to these defendants is that they were put

10   on notice of his claim that he was denied of his clothing and hygiene products via requests and

11   grievances, and that they failed to intervene. (ECF No. 66 at 47.) He provides no evidence that

12   they did so *because* of his protected conduct, *i.e.*, filing grievances or not settling another civil

13   rights action.[6] Therefore, summary judgment should be granted in their favor.

14         The court will now assess the retaliation claim in Count VI insofar as it is asserted against

15   Foster (as Fletcher is no longer in the case). First, Foster argues that the evidence shows Plaintiff

16   had his State clothing as of June 2014, and was given an additional State clothing issue on July 2,

17   2014, and cannot show he was denied the ability to change clothing and stay in the same clothing

18   for seventy-eight days. Second, Foster asserts that even if Plaintiff was denied his personal

19   property, it was not done because he failed to settle a case, but pursuant to ESP regulations which

20   limit the property an inmate can have in the infirmary. If he wanted personal property in the

21   infirmary, he was required under the regulations to seek authorization from his treating physician.

22

23   _____

24       [6] The court does not agree with Defendants' argument that responding to a grievance can never give rise to
liability under section 1983, but in this case, Plaintiff has not provided evidence to create a genuine dispute of material

25   fact as to an element essential to his claim. For example, if Plaintiff was proceeding with an Eighth Amendment claim
which required a showing of deliberate indifference, such as an ongoing denial of medical care or a continuing

26   conditions of confinement claim, the fact that a prison official was given notice of the issue through a grievance and
failed to act would be evidence to support the inmate's claim of liability. This is because the deliberate indifference
standard requires that a prison official know of and disregard a serious risk to inmate health or safety. *See e.g., Snow*

27   *v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012), *overruled in part on other grounds in Peralta v. Dillard*, 744 F.3d
1076 (9th Cir. 2014) (*Snow* found that prison officials were not entitled to summary judgment where there was

28   evidence that they were aware of grievances raising inappropriate medical treatment, and failed to act to prevent
further harm).

In his response, Plaintiff says that he made Foster and Fletcher aware of the denial of clothing and property on a video conference monitor, and they did nothing. He claims that Fletcher had escorted him to a video conference, and Fletcher told Plaintiff he would get his property if he would take care of the case. (ECF No. 66 at 46 ¶ 7.) He asserts that Foster told Fletcher there was no settlement agreement, and Fletcher told Plaintiff's escorting officers not to take him to the facility's property room to receive his property in retaliation for not settling his case. (*Id*. ¶ 8.)

Plaintiff does not address Defendants' argument that he was limited with respect to his property due to prison policies governing infirmary procedures. He never describes exactly what clothing he had or what clothing he did not have. He does not address the evidence produced by Defendants that he was in possession of his State-issued clothing, and that prison policies required him to have a pair of yellow coveralls to wear while housed in the infirmary that he could exchange out for laundering. The only evidence he provides as to Foster is that Foster told Fletcher that the other civil rights action did not settle. It was Fletcher that he claims told him he would not get his property because he did not agree to the settlement, but there is no evidence tying the retaliation claim to Foster. The court finds Plaintiff has failed to raise a genuine dispute of material fact as to whether Foster retaliated against him in Count VI. Therefore, summary judgment should also be granted in Foster's favor. As a result, the court need not reach Defendants' qualified immunity argument.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order

(1) **DISMISSING** Count I **WITHOUT PREJUDICE**;

(2) **GRANTING** summary judgment in Defendants favor with respect to the retaliation claim asserted in Count III;

(3) **GRANTING** summary judgment in Defendants favor with respect to the Fourth Amendment claim asserted in Count III;

(4) **GRANTING** summary judgment in Defendants' favor with respect to the Eighth Amendment claims asserted in Counts IV and V;

(5) **<u>GRANTING</u>** summary judgment with respect to the First Amendment retaliation claim in Count V on the basis that Plaintiff failed to exhaust his administrative remedies;

(6) **<u>GRANTING</u>** summary judgment in favor of Defendants Healer, Sandoval, Baker, Foster, Cox, McDaniel and Sisco in Count VI.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: September 18, 2018.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE